671 A.2d 567

DAVID RIVKIN, EDWARD RIVKIN, AND JUDITH RIVKIN, T/A GALAXY MANOR, A NEW JERSEY PARTNERSHIP, PLAIN-TIFFS-APPELLANTS, v. DOVER TOWNSHIP RENT LEVEL-ING BOARD, DEFENDANT-RESPONDENT.

Argued October 24, 1995—Decided February 29, 1996.

354

*Reuel E. Topas* argued the cause for appellants (*Levin, Shea, Pfeffer, McMahon and Russell,* attorneys).

*Courtland T. Babcock, II,* argued the cause for respondent (*Babcock, Hennes & Bielory,* attorneys).

*Bruce D. Greenberg* argued the cause for *amicus curiae* Hudson County Taxpayers' Association (*Greenbaum, Rowe, Smith, Ravin & Davis,* attorneys).

*Stuart R. Koenig* argued the cause for *amici curiae* New Jersey State League of Municipalities and New Jersey Institute of Municipal Attorneys (*Stickel, Koenig & Sullivan,* attorneys).

*Margaret B. Carmeli* submitted a brief on behalf of *amicus curiae* The New Jersey Manufactured Housing Association (*Giordano, Halleran & Ciesla,* attorneys; *Paul H. Schneider,* of counsel; *Ms. Carmeli* and *Debra J. Rubenstein,* on the briefs).

The opinion of the Court was delivered by

O'HERN, J.

The question in this appeal is whether a party that has appeared before a local rent leveling board has a claim under the Federal Civil Rights Act, 42 *U.S.C.* § 1983, for an unconstitutional deprivation of property when a member of the board has acted in a biased manner and the other members of the board did not remove or disqualify the member lacking in impartiality. The question is related to that concerning an allegedly unconstitutional tax assessment in *General Motors v. Linden,* 143 *N.J.* 336, 671 *A.*2d 560 (1996), also decided today. In *General Motors,* we relied on *National Private Truck Council, Inc. v. Oklahoma Tax Comm'n,* 515 *U.S.* ——, 115 *S.Ct.* 2351, 132 *L.Ed.*2d 509 (1995), to conclude that there was no basis for courts to award relief under § 1983 when an adequate state legal remedy exists to correct an arbitrary tax assessment. We find that similar principles of federalism lead generally to the same conclusion in the context of land use controls.

The primary issue is whether the doctrine of *Parratt v. Taylor,* 451 *U.S.* 527, 101 *S.Ct.* 1908, 68 *L.Ed.*2d 420 (1981), applies in this context of municipal rent controls. *Parratt* holds that when a deprivation of property results from the random and unauthorized

actions of a state employee and pre-deprivation process would have been impracticable, there is no due process violation so long as an adequate post-deprivation remedy is available. We hold that, absent egregious misconduct that shocks the conscience in the sense of violating civilized norms of governance, or invidious discrimination on the part of a board member or board, so long as the State provides a plain, adequate and timely remedy to redress irregularities in the proceedings, a party aggrieved by the determinations of a municipal rent leveling board does not have a claim for relief under 42 *U.S.C.* § 1983.

I

David Rivkin, Edward Rivkin, and Judith Rivkin are partners in Galaxy Manor, a mobile home park in Dover Township. Dover Township has a Mobile Home Park Rent Leveling Ordinance ("Code") that requires landlords to apply to the Dover Township Rent Leveling Board ("Board") for rental increases. Dover Code § 104–35A provides that the Board be made up of one mobile home park landlord, one mobile home park tenant, and three non-affiliated public members.

In May 1990, the Rivkins filed an application with the Board for a rent increase based on $59,624.96 of capital improvements to the Galaxy Manor mobile home park. The Code provides:

A landlord may seek an additional charge for major capital improvements.... The landlord seeking a capital improvement surcharge shall appeal for said surcharge to the Rent Leveling Board, which shall determine ... if said improvement is a major improvement and, if so, the amount of increase granted for such major improvement and establish the conditions of such increase.

[Dover Code § 104–34B.]

The Board conducted four hearings on the application in June, July, August and October, 1990. Edward Baltarzuk, the mobile home park tenant member of the Board, took an active part in the proceedings. Baltarzuk, who was actually a resident of the Galaxy Manor Mobile Home Park, appeared to view his position on the Board as one of advocacy rather than adjudication. He stated on the record that it was his function to "serve the people of the

mobile home park." He continually challenged the Rivkins and their representatives both on a personal basis, referring to their attorney as a "yo-yo," and on a partisan basis, introducing facts from outside the record.

Baltarzuk's manner was threatening to the Rivkins. He said: "You are looking for trouble and you are going to get it." Baltarzuk urged a tenant witness to file a complaint against the Rivkins for violating equal housing opportunity laws. The following is a typical antagonistic exchange between the Rivkins and Baltarzuk:

> Mr. Levin (attorney for Rivkin): That is our application. Our obligation is to provide this application—
>
> Mr. Baltarzuk: You are supposed to file the truth, sir.
>
> Mr. Levin: Before you call anyone a liar, you are the fellow that is challenging our application without giving us the benefit of telling us where you get the information.
>
> Mr. Rivkin, is the rental structure as contained within the application true and accurate?
>
> Mr. Rivkin: As of the first of May, yes.
>
> Mr. Baltarzuk: Therefore, this application should not even be heard. It is an illegal rental increase. I have a person right here in the audience who is paying a wrong rent. How can she pay 275? You are telling me here she is paying 223.
>
> Mr. Levin: I find this incredible, that somebody who has to make a judgment here has apparently taken it upon himself to go out and solicit whatever it is your [sic] trying to tell us . . . .

Baltarzuk, in essence, offered himself as a witness concerning certain items and was, in effect, testifying in the proceedings.

The Rivkins requested that Baltarzuk be removed from the proceedings. The Board denied these requests and, with Baltarzuk participating, granted $20,641.42 in rent increases for capital improvements, finding that the majority of the Rivkins' application constituted "capital expenditures" rather than "major capital improvements" under the ordinance. Capital expenditures may not be recovered by rent increases.

The Rivkins appealed to the Law Division to determine the amount of the rental increase. They claimed that the "arbitrary, capricious, and unreasonable" findings of the Board and the failure

of the Board to disqualify Baltarzuk for his obvious bias constituted a civil rights violation allowing recovery of damages and attorney's fees under 42 *U.S.C.* § 1983.

The Law Division reserved decision on the application for attorney's fees but agreed that Baltarzuk's misconduct and manifest bias had tainted the proceedings. However, it refused to make a substantive determination on the rental increase. It ruled that the Board members were not biased and would not be influenced once Baltarzuk was removed. The court remanded the matter to the Board with all issues to be reconsidered without the participation of Baltarzuk. The Appellate Division denied the Rivkins' motion for leave to appeal the remand order. The hearings proceeded on remand without the participation of Baltarzuk. Upon rehearing, the Board approved an additional increase of $25,089.67 for a total of $45,731.09. The Law Division then disposed of the issue of attorney's fees and constitutional damages. In its bench opinion, the Law Division found that Baltarzuk's actions had "permeated the Board," "that the Board was recalcitrant with respect to th[e] matter" of his participation, and had "violated the plaintiffs' due process rights." It awarded $39,679.55 in counsel fees and $6,303.34 in compensatory damages under 42 *U.S.C.* §§ 1983, 1988.

Both parties appealed. The Rivkins appealed the remand to the Board, claiming that the Law Division should have made the substantive determination of the rental increase because the entire Board had been tainted by Baltarzuk's bias. The Board appealed the imposition of § 1983 relief and attorney's fees.

The Appellate Division affirmed the remand order, but found that the plaintiffs had suffered no due process violation under § 1983, and therefore were not entitled to attorney's fees or compensatory damages. 277 *N.J.Super.* 559, 570, 649 *A.*2d 1356 (1994). Basing its ruling on *Parratt v. Taylor,* 451 *U.S.* 527, 101 *S.Ct.* 1908, 68 *L.Ed.*2d 420 (1981), the Appellate Division found the actions of Baltarzuk to be "random and unauthorized," that the plaintiffs had had an adequate post-deprivation remedy under

state law, and that the requirements of procedural due process had been satisfied. We granted plaintiffs' petition for certification. 140 *N.J.* 275, 658 *A.*2d 299 (1995).

## II

Section 1983 is the modern codification of the first section of legislation passed as part of the Ku Klux Klan Act of 1871 ("the Act").[1] The Act, entitled "an Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes," addressed conditions then prevalent in some of the Southern States. *Monroe v. Pape*, 365 *U.S.* 167, 171–73, 81 *S.Ct.* 473, 476–77, 5 *L.Ed.*2d 492, 497 (1961) (quotation omitted). At that time, former slaves and their descendants were subjected to egregious violations of liberty and property, and state governments were either incapable or unwilling to protect these citizens. During debate in the House of Representatives, Mr. Beatty, a Member of Congress from Ohio, summarized the conditions that the Act was meant to address:

Men were murdered, houses were burned, women were outraged, men were scourged, and officers of the law shot down; and the State made no successful effort to bring the guilty to punishment or afford protection or redress to the outraged and innocent.

[*Id.* at 175, 81 *S.Ct.* at 478, 5 *L.Ed.*2d at 499 (citing Cong. Globe, 42d Cong., 1st Sess., 428).]

---

1 As originally enacted, the protection of the law extended only to the rights, privileges and immunities secured by the Constitution. The Act was later amended to cover rights secured by "the laws" of the United States. Section 1983 now reads in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[42 *U.S.C.* § 1983 (1988).]

The Act addressed these problems in three ways; it overrode certain state laws, it provided a remedy where state law was inadequate, and it provided a federal remedy where the state remedy was adequate but unavailable in practice. *Id.* at 173–74, 81 *S.Ct.* at 477, 5 *L.Ed.*2d at 498. As the title of the Act states, the constitutional basis of the Act was the Fourteenth Amendment. However, in the *Slaughter-House Cases,* 83 *U.S.* (16 Wall.) 36, 21 *L.Ed.* 394 (1873), the Supreme Court narrowly construed the rights conferred by the Fourteenth Amendment. The Court ruled that only those rights that "owe their existence to the Federal government, its national character, its Constitution, or its laws" applied to the states by way of the Fourteenth Amendment. *Id.* at 79, 21 *L.Ed.* 394. Civil rights were specifically excluded from those the Court deemed subject to federal review through the Fourteenth Amendment. *Ibid.* "[S]ection 1983 ... lay dormant as a result of restrictive judicial construction until the Supreme Court's 1961 decision in *Monroe v. Pape.*" Note, *Section 1983 and Federalism,* 90 *Harv.L.Rev.* 1133, 1135–36 (1977).

In *Monroe v. Pape, supra,* a husband and wife sued the City of Chicago and its police officers for a violation of their Fourth Amendment rights when the police conducted a warrantless search of their home and subjected the husband to a humiliating strip search. In finding that the local police officers were liable to the plaintiffs for their unlawful action, irrespective of an available state remedy, the Court refused to limit the Act to the circumstances described in the arguments made in favor of its passage:

> Although the legislation was enacted because of the conditions that existed in the South at that time, it is cast in general language and is as applicable to Illinois as it is to the States whose names were mentioned over and again in the debates.... Hence the fact that Illinois by its constitution and laws outlaws unreasonable searches and seizures is no barrier to the present suit in the federal court.
>
> [*Monroe, supra,* 365 *U.S.* at 183, 81 *S.Ct.* at 482, 5 *L.Ed.*2d at 502–03.]

So well-developed a body of law has followed *Monroe* that an entire treatise is devoted to this single section of the Code. Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983* (3d ed. 1991).

Ordinarily, the first task in any § 1983 action is to identify the state actor, "the person acting under color of law," that has caused the alleged deprivation. *See Monell v. New York City Dep't of Social Services*, 436 *U.S.* 658, 691, 98 *S.Ct.* 2018, 2036, 56 *L.Ed.*2d 611, 636 (1978). The Board does not dispute that its members were "persons acting under color of law." [2]

The second task is to identify a "right, privilege or immunity" secured to the claimant by the Constitution or other federal laws of the United States. 42 *U.S.C.* § 1983 (1988). Plaintiffs often misstate their claims by alleging a violation of § 1983 rights. Section 1983 "is not itself a source of substantive rights," but merely provides "a method of vindicating federal rights elsewhere conferred...." *Baker v. McCollan*, 443 *U.S.* 137, 144 n. 3, 99 *S.Ct.* 2689, 2694 n. 3, 61 *L.Ed.*2d 433, 442 n. 3 (1979). We must therefore first identify the specific constitutional rights allegedly infringed.

### III

### SUBSTANTIVE DUE PROCESS

In this case, plaintiffs primarily assert that they have been denied their constitutionally guaranteed rights under the Fourteenth Amendment to "substantive due process" and, in the alternative, that they have been deprived of property without the "procedural due process" guaranteed by the Fourteenth Amendment.

In his concurring opinion in *Daniels v. Williams*, 474 *U.S.* 327, 106 *S.Ct.* 662, 88 *L.Ed.*2d 662 (1986), Justice Stevens explained

---

[2] There is no issue asserted of qualified or absolute immunity for the Board members. Absolute immunity for individual state actors largely is reserved for those acting in judicial or quasi-judicial capacities. *See Butz v. Economou*, 438 *U.S.* 478, 507, 514, 98 *S.Ct.* 2894, 2911, 2915, 57 *L.Ed.*2d 895, 916, 921 (1978); *Anastasio v. Planning Bd. of West Orange*, 209 *N.J.Super.* 499, 524, 507 A.2d 1194 (App.Div.1986).

that the Due Process Clause is the source of three different kinds of constitutional protection:

> First, it incorporates specific protections defined in the Bill of Rights.... Second, it contains a substantive component, sometimes referred to as "substantive due process," which bars certain arbitrary government actions "regardless of the fairness of the procedures used to implement them." Third, it is a guarantee of fair procedure, sometimes referred to as "procedural due process" [under which the State may not] take property without providing appropriate procedural safeguards.
>
> [*Id.* at 337, 106 *S.Ct.* at 677–78, 88 *L.Ed.*2d at 672 (Stevens, J., concurring) (citation and footnotes omitted).]

Richard Arnold, Chief Judge of the Eighth Circuit Court of Appeals, has described the doctrine of substantive due process as "an oxymoron if there ever was one" and as "a linguistic monstrosity, if not a legal one." *Lemke v. Cass County,* 846 *F.*2d 469, 471 (8th Cir.1987) (Arnold, J., concurring). In its most discredited form, the substantive due process doctrine led to the invalidation of many state and federal attempts to enact social legislation. *See, e.g., Lochner v. New York,* 198 *U.S.* 45, 64, 25 *S.Ct.* 539, 546, 49 *L.Ed.* 937, 944–45 (1905) (invalidating overtime labor law as undue interference with freedom of contract). Suffice it to observe that considerable confusion surrounds the doctrine. Michael T. Carton, Note, 25 *Seton Hall L.Rev.* 1560, 1560–61 (1995) (remarking that substantive due process analysis has resulted in "obscure and ... contradictory holdings, widespread debate, and general perplexity").

To understand the concept of substantive due process, it is necessary to understand that prior to the application of many of the specific provisions of the Bill of Rights to the states the primary federal protection against state action was in the Due Process Clause of the Fourteenth Amendment. *See* Rosalie Berger Levinson, *Protection Against Government Abuse Of Power: Has The Court Taken The Substance Out Of Substantive Due Process,* 16 *U. Dayton L.Rev.* 313 (1991) (observing that only after gradual process of incorporation did most of provisions of Bill of Rights apply to states through Fourteenth Amendment Due Process Clause) [hereinafter Levinson]. *Rochin v. California,* 342

*U.S.* 165, 72 *S.Ct.* 205, 96 *L.Ed.* 183 (1951), is a noted example of a substantive due process violation in the pre-incorporation era. In *Rochin*, the Court determined that the actions of police officers in instructing a doctor to pump Rochin's stomach against his will were "so brutal and so offensive to human dignity" that they "offend[ed] a sense of justice" and resulted in denying Rochin his substantive due process rights. *Id.* at 173–74, 72 *S.Ct.* at 210, 96 *L.Ed.* at 190–91 (quotation omitted). Justice Frankfurter equated the conduct of the officers in *Rochin* with the conduct of police officers in *Malinski v. New York*, 324 *U.S.* 401, 414, 65 *S.Ct.* 781, 787–88, 89 *L.Ed.* 1029, 1037 (1945), which, the Justice said, had violated "civilized standards of law." *Rochin, supra*, 342 *U.S.* at 169, 169 n. 2, 72 *S.Ct.* at 208, 208 n. 2, 96 *L.Ed.* at 188, 188 n. 2. In its most characteristic form, substantive due process is reserved for "state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning and harmful as literally to shock the conscience of a court." *Ramos v. Gallo*, 596 *F.Supp.* 833, 837 (D.Mass.1984).

It is to this background that we may relate the Court's statement in *Albright v. Oliver*, 510 *U.S.* 266, ——, 114 *S.Ct.* 807, 813, 127 *L.Ed.*2d 114, 123–24 (1994), that, when a particular provision of the Bill of Rights "provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing th[e] claim." *Ibid.* (quotation omitted).

The Supreme Court has long hesitated to afford an overly broad reading to the substantive component of the Due Process Clause. The *Albright* decision (involving a detention based upon an unsubstantiated warrant) is only the most recent manifestation of the Court's reluctance to expand the doctrine. *See Collins v. City of Harker Heights*, 503 *U.S.* 115, 125, 112 *S.Ct.* 1061, 1068, 117 *L.Ed.*2d 261, 273 (1992) ("As a general matter, the Court has always been reluctant to expand the concept of substantive due

process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.").

In the light of the clearly evident trend of the Supreme Court to limit substantive due process rights under the Fourteenth Amendment, we believe that the denial of a property right in the context of municipal governance rarely will rise to the level of a substantive due process violation.

 The substantive due process doctrine "does not protect individuals from all governmental actions that infringe liberty or injure property in violation of some law." *PFZ Properties, Inc. v. Rodriguez*, 928 *F.*2d 28, 31 (1st Cir.) (quotation and citations omitted), *cert. granted,* 502 *U.S.* 956, 112 *S.Ct.* 414, 116 *L.Ed.*2d 435 (1991), *and cert. dismissed,* 503 *U.S.* 257, 112 *S.Ct.* 1151, 117 *L.Ed.*2d 400 (1992). Rather, substantive due process is reserved for the most egregious governmental abuses against liberty or property rights, abuses that "shock the conscience or otherwise offend ... judicial notions of fairness ... [and that are] offensive to human dignity." *Weimer v. Amen,* 870 *F.*2d 1400, 1405 (8th Cir.1989) (quotations omitted). With the exception of certain intrusions on an individual's privacy and bodily integrity, the collective conscience of the United States Supreme Court is not easily shocked. *See Irvine v. California,* 347 *U.S.* 128, 133, 74 *S.Ct.* 381, 384, 98 *L.Ed.* 561, 569 (1954) (finding no Fourteenth Amendment violation when state police officers broke into defendant's home and secretly placed a microphone in defendant's bedroom, as the trespass involved no coercion, violence or brutality to the defendant). Recall that in *Rochin* Justice Frankfurter had equated substantive due process violations with governmental abuses that "are ... too close to the rack and the screw to permit of constitutional differentiation." *Rochin, supra,* 342 *U.S.* at 172, 72 *S.Ct.* at 210, 96 *L.Ed.* at 190. The conduct of an errant board member who berated an applicant and brought in facts outside the record at a rent proceeding in violation of acceptable board practice does not rise to the level of a substantive due process violation under the Supreme Court's standards.

In *Creative Environments, Inc. v. Estabrook,* 680 *F.*2d 822 (1st Cir.), *cert. denied,* 459 *U.S.* 989, 103 *S.Ct.* 345, 74 *L.Ed.*2d 385 (1982), the First Circuit Court of Appeals rejected a real estate developer's claim that a municipal planning board deprived the corporation of its substantive due process rights under the Fourteenth Amendment. The corporation alleged a conspiracy by the planning board to deny the corporation's subdivision plan. It based its conspiracy theory upon the town's "overall distortion of the existing statutory and regulatory scheme ... [and] arbitrary misapplication of state law." *Id.* at 831.

While acknowledging that "it [was] not impossible to derive a theoretical basis for [the corporation's substantive due process] argument" from certain Supreme Court cases, the court nevertheless observed that

> were such a theory to be accepted, any hope of maintaining a meaningful separation between federal and state jurisdiction in this and many other areas of law would be jettisoned. Virtually every alleged legal or procedural error of a local planning authority or zoning board of appeal could be brought to a federal court on the theory that the erroneous application of state law amounted to a taking of property without due process. Neither Congress nor the courts have, to date, indicated that section 1983 should have such a reach.

[*Ibid.*]

The *Creative* court acknowledged that official misconduct that deprives one of a property interest may rise to the level of a substantive due process violation in limited instances, as when a government body's actions are motivated by racial animus or political or personal bias, but that the corporation in *Creative* had not alleged such abuse. *Id.* at 832 (citing *Progress Dev. Corp. v. Mitchell,* 286 *F.*2d 222 (7th Cir.1961) (racial animus); *Cordeco Dev. Corp. v. Santiago Vasquez,* 539 *F.*2d 256 (1st Cir.) (personal and political bias), *cert. denied,* 429 *U.S.* 978, 97 *S.Ct.* 488, 50 *L.Ed.*2d 586 (1976)). The court concluded its substantive due process analysis by noting that

> [t]he authority cited by [the corporation], as well as other cases, all suggest that the conventional planning dispute—at least when not tainted with fundamental procedural irregularity, racial animus, or the like—which takes place within the

framework of an admittedly valid state subdivision scheme is a matter primarily of concern to the state and does not implicate the Constitution. This would be true even were planning officials to clearly violate, much less "distort" the state scheme under which they operate.... Every appeal by a disappointed developer from an adverse ruling by a local ... planning board necessarily involves some claim that the board exceeded, abused or "distorted" its legal authority in some manner, often for some allegedly perverse ... reason.

[*Id.* at 833 (quotation, citation and footnote omitted).] [3]

■ Other federal circuits have found that when property rights are denied in the course of conventional municipal decisionmaking there is no substantive due process violation. *See Chesterfield Dev. Corp. v. City of Chesterfield,* 963 *F.*2d 1102 (8th Cir.1992) (determining that city's bad-faith violation of state law in enforcing invalid zoning plan against development remains violation of state law and does not give rise to substantive due process violation); *Harding v. County of Door,* 870 *F.*2d 430, 431–32 (7th Cir.) (finding no substantive due process violation when county revoked building permit after construction of housing project had commenced, notwithstanding that state reviewing court had determined the action to be illegal), *cert. denied,* 493 *U.S.* 853, 110 *S.Ct.* 154, 107 *L.Ed.*2d 112 (1989).

■ Even though the Rent Leveling Board may have violated its own standards of governance by allowing a member with a demonstrated bias to participate in the hearings, we believe that such governmental action does not give rise to a substantive due process claim.

We acknowledge that the standard that we adopt today may be contrary to a more expansive interpretation given the Due Process Clause by many circuit courts, which have found that "arbitrary or irrational" government actions deny substantive due process rights. *See, e.g., DeBlasio v. Zoning Bd. of Adjustment,* 53 *F.*3d 592, 593 (3d Cir.) (concluding that "in the context of land use regulation, a property owner states a substantive due process

---

[3] A corollary to the holding in *Albright v. Oliver, supra,* is that the Supreme Court will presumably use equal protection analysis to resolve racial animus cases in the future.

claim where he or she alleges that the decision limiting the intended land use was arbitrarily or irrationally reached"), *cert. denied*, —— U.S. ——, 116 *S.Ct.* 352, 133 *L.Ed.*2d 247 (1995); *Del Monte Dunes v. City of Monterey*, 920 *F.*2d 1496, 1508 (9th Cir.1990) (citations omitted) ("[T]o establish their substantive due process claim, appellants must show that the City's decision to deny tentative map approval and to refuse an extension of the conditional use permit was arbitrary and irrational"); *Brady v. Town of Colchester*, 863 *F.*2d 205, 215 (2d Cir.1988) (declaring that substantive due process assures property owner's right to be free from arbitrary or irrational zoning actions); *Bello v. Walker*, 840 *F.*2d 1124, 1129 (3d Cir.) (determining that substantive due process rights may be violated when municipal council arbitrarily and irrationally interferes with building permit process), *cert. denied*, 488 *U.S.* 851, 109 *S.Ct.* 134, 102 *L.Ed.*2d 107, *and cert. denied*, 488 *U.S.* 868, 109 *S.Ct.* 176, 102 *L.Ed.*2d 145 (1988); *Scott v. Greenville County*, 716 *F.*2d 1409, 1419 (4th Cir.1983) ("Arbitrariness, abuse of discretion, caprice or unfairness giv[e] rise to a constitutional claim [of denial of substantive due process in state permit processing actions]").

It is a mistake, however, to equate the concept of "arbitrary and irrational" governmental land use decisions with the substantive component of the Due Process Clause of the Fourteenth Amendment. In the land use context, the phrases "arbitrary and irrational" or "capricious" are often shorthand expressions for a standard of review that asks whether there are sufficient facts in the record to support the agency's action or whether the agency has followed its legislative mandate. *Bow & Arrow Manor v. Town of West Orange*, 63 *N.J.* 335, 343, 307 *A.*2d 563 (1973).

In *Anastasio v. Planning Bd. of West Orange*, 209 *N.J.Super.* 499, 521–22, 507 *A.*2d 1194, *certif. denied*, 107 *N.J.* 46, 526 *A.*2d 136 (1986), the Appellate Division expressly declined to find a due process violation and award damages under § 1983 because a township planning board's rejection of a real estate developer's

application for a development plan "was arbitrary and capricious."[4] The *Anastasio* court observed that

> [f]requently in our law a court on an appeal from action of a public agency will determine if the agency acted arbitrarily or capriciously. Accordingly while the words "arbitrary and capricious" may sound harsh, they are simply the standard of appellate review in particular cases.
>
> [*Id.* at 522, 507 *A.*2d 1194 (citations omitted).]

*See also Silverman v. Rent Leveling Bd.*, 277 *N.J.Super.* 524, 538, 649 *A.*2d 1342 (App.Div.1994) (agreeing that it would be improper to hold municipal agency liable under § 1983 merely for mistakenly exercising power under state law), *certif. denied*, 139 *N.J.* 443, 655 *A.*2d 445 (1995). It is for this reason that Chief Judge Arnold cautioned that substantive due process protections should be reserved for "truly irrational" governmental abuses that bear no relationship to the merits of the pending matter. Judge Arnold offers as an example of such truly irrational conduct a governmental body that "flips a coin" to make a decision. *Lemke, supra*, 846 *F.*2d at 472 (Arnold, J., concurring). Although Baltarzuk's conduct during the rent proceedings may have violated some state law, it was not "truly irrational." Baltarzuk appears to have mistakenly believed that it was his duty to serve as a tenants' advocate. From this mistaken premise, Baltarzuk's actions were rational. Moreover, all of Baltarzuk's actions were related to the merits of the rent proceeding. The Board's original determinations about the eligibility, as capital improvements, of things such as a "Bob–Cat" loader were at least debatable. And Baltarzuk was correct that the base rent of one of the tenants was misstated.

We believe that the contrary decisions (giving broad reach to the doctrine of substantive due process) limit their focus to the

---

[4] We are aware that *Gregg v. Township Comm. of Hazlet*, 232 *N.J.Super.* 34, 556 *A.*2d 348 (App.Div.1989), suggests that a § 1983 claim arises when a public body abuses its authority. However, *Gregg* did not address the standards for establishing a § 1983 due process violation in the land use context because the township had conceded on appeal that plaintiff had established such a violation. *Id.* at 37, 556 *A.*2d 348. Rather, *Gregg* addressed the standards for granting attorney fees under 42 *U.S.C.* § 1988 after a constitutional violation has been established.

words of the Supreme Court that the Due Process Clause was "intended to secure the individual from the arbitrary exercise of the powers of government," *Daniels, supra,* 474 *U.S.* at 331, 106 *S.Ct.* at 665, 88 *L.Ed.*2d at 668 (quotations omitted), without considering the degree of the abuse of power that must be displayed before invoking the substantive component of that particular clause. *Irvine, supra,* 347 *U.S.* at 133, 74 *S.Ct.* at 383, 98 *L.Ed.* at 569.

■ "The lower courts' differing approaches to the treatment of substantive due process in these areas suggest the obvious need for Supreme Court clarification." Levinson, *supra,* 16 *U. Dayton L.Rev.* at 318. Until that clarification, however, we seriously doubt that the Supreme Court will find a substantive due process violation to exist when a governmental body denies a property right by conduct that is "arbitrary or irrational" under state law but neither shocking to the conscience of a court in the sense of being a departure from civilized norms of governance, nor offensive to human dignity. *See Rochin, supra,* 342 *U.S.* at 172–74, 72 *S.Ct.* at 210, 96 *L.Ed.* at 190–91.

## IV

## PROCEDURAL DUE PROCESS

### A. *Parratt* Doctrine

Analytically, the Rivkins' case is much closer to a procedural due process claim. Plaintiffs contend that the presence of a tainted board member deprived them of property, a fair rate of return on their investment, without due process of law. Their case amounts to an allegation that the State failed to furnish an impartial tribunal, which "is a matter of procedural, not substantive, due process." *Holloway v. Walker,* 784 *F.*2d 1287, 1293 (5th Cir.), *cert. denied,* 479 *U.S.* 984, 107 *S.Ct.* 571, 93 *L.Ed.*2d 576 (1986); *accord Marshall v. Jerrico, Inc.,* 446 *U.S.* 238, 242, 100 *S.Ct.* 1610, 1613, 64 *L.Ed.*2d 182, 188 (1980) (stating that "require-

ment of neutrality in adjudicative proceedings safeguards the ... concerns of procedural due process").

■ The trial court and Appellate Division found that Baltarzuk tainted the deliberations of the Board by participating in the hearings with a preconceived bias against the Rivkins' application, behaving as an advocate for the tenants during the hearing, and relying on evidence outside the record. *Rivkin, supra,* 277 *N.J.Super.* at 561, 649 *A.*2d 1356. Although Baltarzuk maintained that he was not prejudiced and should not have been disqualified, we accept the lower courts' findings for purposes of this appeal. More is required to sustain a claim under 42 *U.S.C.* § 1983, however, than a demonstration that a partial board member participated in the regulatory proceedings. *Parratt, supra,* held that "for a deprivation of property to violate the Due Process Clause of the Fourteenth Amendment it must occur without the opportunity to be heard at a meaningful time and in a meaningful manner." Karen M. Blum, *Applying the* Parratt/Hudson *Doctrine: Defining the Scope of the* Logan *Established State Procedure Exception and Determining the Adequacy of State Postdeprivation Remedies,* 13 *Hastings Const. L.Q.* 695, 698–99 (1986) [hereinafter Blum]. (Parts of *Parratt* not relevant here were overruled by *Daniels v. Williams, supra,* 474 *U.S.* 327, 106 *S.Ct.* 662, 88 *L.Ed.*2d 662 (1986).) To avoid violating the Due Process Clause, the State must have afforded the Rivkins a fair hearing on their claims at a meaningful time.

■ While it is preferable for states to provide a pre-deprivation hearing whenever practicable, the Supreme Court has "rejected the proposition that 'at a meaningful time and in a meaningful manner' *always* requires the State to provide a hearing prior to the initial deprivation of property." *Parratt, supra,* 451 *U.S.* at 540, 101 *S.Ct.* at 1915, 68 *L.Ed.*2d at 432 (footnote omitted). At times, for a state to provide any meaningful pre-deprivation process simply may not be possible. Such circumstances arise if a state must take immediate action, or if the loss of property is caused by the unpredictable conduct of state officials. *Watts v.*

*Burkhart,* 854 *F.*2d 839, 842 (6th Cir.1988). The Supreme Court has acknowledged that

> the timing and nature of the required hearing "will depend on the appropriate accommodation of the competing interests involved." These include the importance of the private interest and the length or finality of the deprivation, the likelihood of governmental error, and the magnitude of the governmental interests involved.
>
> [*Logan v. Zimmerman Brush Co.,* 455 *U.S.* 422, 434, 102 *S.Ct.* 1148, 1157, 71 *L.Ed.*2d 265, 277 (1982) (citations and footnote omitted).]

Post-deprivation remedies are most likely to be deemed satisfactory substitutes for pre-deprivation process when a meaningful pre-deprivation hearing is impracticable, and property rather than a life or liberty interest is at stake. *See* Blum, *supra,* 13 *Hastings Const. L.Q.* at 699–700. *Parratt v. Taylor* illustrates the point. That case involved an inmate at a Nebraska prison who ordered a hobby kit valued at $23.50. The kit was lost after being delivered to the prison. The inmate brought suit in the United States District Court under § 1983, claiming that he had been deprived of his property without due process of law. *Parratt, supra,* 451 *U.S.* at 529, 101 *S.Ct.* at 1910, 68 *L.Ed.*2d at 425. The district court granted summary judgment in favor of the inmate and the Eighth Circuit affirmed. In reversing these lower court decisions, the Supreme Court asserted that accepting plaintiff's position would turn every alleged injury inflicted by a state official acting under color of law into a violation of the Fourteenth Amendment cognizable under § 1983. *Parratt, supra,* 451 *U.S.* at 544, 101 *S.Ct.* at 1917, 68 *L.Ed.*2d at 434.

The Supreme Court fit *Parratt* within the framework of cases in which pre-deprivation process was impracticable because the plaintiff was deprived of property as the result of a random and unauthorized act of a state employee. "In such a case, the loss is not a result of some established state procedure and the state cannot predict precisely when the loss will occur." *Id.* at 541, 101 *S.Ct.* at 1916, 68 *L.Ed.*2d at 432. Thus, an adequate post-deprivation hearing will satisfy the requirements of the Due Process Clause. *Hudson v. Palmer,* 468 *U.S.* 517, 104 *S.Ct.* 3194, 82 *L.Ed.*2d 393 (1984), reaffirmed *Parratt* and extended this post-

deprivation doctrine to cases involving the intentional deprivation of property by a state official. The Court held that an inmate whose personal property was intentionally destroyed by a corrections officer during a search for contraband could not sustain a § 1983 claim because adequate state tort remedies were available to redress the deprivation.

The *Parratt* doctrine does not apply—and pre-deprivation process is required—when deprivations without procedural fairness are predictable in nature. Frederic S. Schwartz, *The Postdeprivation Remedy Doctrine of* Parratt v. Taylor *and its Application to Cases of Land Use Regulation,* 21 *Ga.L.Rev.* 601, 607 (1987) [hereinafter Schwartz]. In *Logan v. Zimmerman Brush Co.,* 455 *U.S.* 422, 102 *S.Ct.* 1148, 71 *L.Ed.*2d 265 (1982), plaintiff's employment discrimination claim expired without notice to him when the Illinois Fair Employment Practices Commission failed to convene a fact-finding conference within the 120–day period mandated by Illinois law. Plaintiff brought suit under § 1983, asserting that the state's inaction denied him his constitutional right to due process. The Supreme Court held that the existence of a post-deprivation state remedy—there, an independent tort action—is constitutionally inadequate when the deprivation of property results from an established state procedure. The Court stated:

> It is the state system itself that destroys a claimant's property interest, by operation of law, whenever the Commission fails to convene a timely conference.... Logan is challenging not the Commission's error, but the "established state procedure" that destroys his entitlement without according him proper procedural safeguards.

> [*Logan, supra,* 455 *U.S.* at 436, 102 *S.Ct.* at 1158, 71 *L.Ed.*2d at 278.]

Thus, a threshold question in any procedural due process case is whether the deprivation was caused by random and unauthorized conduct or whether it resulted from an established state procedure.

The Appellate Division held that Baltarzuk's actions as a member of the Rent Leveling Board constituted random and unauthorized conduct within the meaning of the *Parratt* doctrine. That

characterization applies to behavior of state officials that is not reasonably anticipated, and therefore cannot practicably be addressed by the provision of pre-deprivation remedies. The Supreme Court's decision in *Zinermon v. Burch*, 494 *U.S.* 113, 110 *S.Ct.* 975, 108 *L.Ed.*2d 100 (1990), explains the concepts. In *Zinermon*, the Court held that the *Parratt* doctrine did not serve to bar plaintiff's claim that his due process rights were violated when state officials admitted him to a state mental hospital as a voluntary patient even though he was incompetent to give informed consent to his admission. Because the flaw in Florida's procedure (permitting an incompetent to commit himself) was a structural one that the government could clearly anticipate, plaintiff's claim fit within the *Logan* doctrine rather than the *Parratt/Hudson* doctrine. Thus, the availability of post-deprivation process did not serve to defeat plaintiff's § 1983 claim.

The Rivkins maintain that even if Baltarzuk's actions were random and unauthorized, and therefore unpredictable, the Rent Leveling Board's were not. They contend that the Board as policy-maker established the deficient state procedures by permitting Baltarzuk to participate in the hearing even after he had demonstrated an inability to act impartially. This Board conduct would, in their view, obviate the need to conduct a *Parratt* analysis by placing the case within the *Logan/Zinermon* framework.

Although New Jersey law does proscribe conflicts of interest on the part of public officials, the assumption of our law is that members will disqualify themselves, not that a municipal board will act affirmatively to disqualify its own members.

> Whenever a substantial question is raised as to the disinterestedness of one of several officials sitting on a matter, and the other officials can take care of the case, it usually is just as well for the official in question to withdraw therefrom, so that not the faintest shadow be cast on the integrity of the determination.
>
> [*Hochberg v. Freehold Racing Ass'n*, 40 *N.J.Super.* 276, 284, 123 *A.*2d 46 (App.Div.1956).]

*See Griggs v. Princeton Borough*, 33 *N.J.* 207, 222, 162 *A.*2d 862 (1960) (setting aside planning board's actions because board member's employer had financial interest in decisions of board). In

the Rivkins' case, one Board member did disqualify himself when the Board attorney pointed out a possible conflict. The Board attorney did attempt to chasten Baltarzuk. In response, he stoutly maintained that he was not biased, and was simply conducting a searching investigation of the case—"just asking for correct figures."

Moreover, the available federal precedent does not draw this proffered distinction between Baltarzuk's conduct and the Board's collective conduct and thereby remove the case from the strictures of the *Parratt* doctrine. Recall that in *Logan* the Court stated, "Logan is challenging not the Commission's error, but the 'established state procedure' that destroys his entitlement without according him proper procedural safeguards." *Logan, supra,* 455 *U.S.* at 436, 102 *S.Ct.* at 1158, 71 *L.Ed.*2d at 278. To hold that the Board's error created an established state procedure would "convert every departure from established administrative procedures into a violation of the Fourteenth Amendment, cognizable under § 1983." *PFZ Properties, supra,* 928 *F.*2d at 31.

Admittedly, the analogy to *Parratt* is not perfect. *Parratt* involved the conduct of a state employee—this case involves the conduct of a public board or body that is, in itself, an organ of state government. Nor does this case involve a denial of a pre-deprivation hearing—there was a pre-deprivation hearing but that hearing was flawed. Still we believe that the analogy to *Parratt* is appropriate. "The requirements of procedural due process are 'norms addressed to legal systems as a whole rather than to individual government actors.'" Schwartz, *supra,* 21 *Ga.L.Rev.* at 611 (quoting Laurence H. Tribe, *American Constitutional Law* § 18–4, at 1162 n. 15 (1st ed. 1978)). "Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Zinermon, supra,* 494 *U.S.* at 126, 110 *S.Ct.* at 983, 108 *L.Ed.*2d at 114. We must look at the legal system as a whole.

*Amicus* Hudson County Taxpayers' Association acknowledges that most municipal boards are comprised of inexpert, part-time laypersons who operate in a highly charged political atmosphere. As a result, judicial review is an integral part of the State's governance of its local boards and bodies. For reasons discussed more fully in Part B hereof, the New Jersey Constitution guarantees government under law at the local level. This is especially true in the context of land use law in which judicial review ensures full accountability. The qualitative difference between procedural unfairness in a case such as this and that in *Logan* and *Zinermon* is that the state action in those cases was both institutional (the procedures were built-in) and final (in *Logan*, plaintiff's lawsuit "was forever barred"; in *Zinermon*, the patient's liberty was irretrievably lost).

And even though the ordinance creating the Rent Leveling Board calls for the participation of a tenant representative, this State system itself neither caused the deprivation of the Rivkins' property nor itself amounts to a per se violation of the Rivkins' procedural due process rights. In fact, the ordinance requires the Board to base its determination on the reasonable, credible evidence before it. Rather, it was the unpredictable behavior of the tenant representative, which went well beyond the bounds contemplated by the ordinance, that spawned the Rivkins' problems. When Baltarzuk tainted the Board's proceedings by behaving as a tenant advocate and introducing evidence from outside the record, he was acting on his own initiative without State authorization. The State is not required to anticipate random and unauthorized violations of its own constitutionally adequate procedures. *PFZ Properties, supra,* 928 *F*.2d at 31. Nor may a state effectively anticipate random and unauthorized violations of established state procedures by its lesser boards or bodies in the land use context. Thus, the deprivation—the delay in receiving a fair rental allowance—will not be deemed to be in violation of the Due Process Clause if adequate post-deprivation remedies were available to the Rivkins. *Parratt, supra,* 451 *U.S.* at 539, 101 *S.Ct.* at 1915, 68 *L.Ed.*2d at 431.

## B. Adequacy of Plaintiffs' Remedy

■ The post-deprivation remedy that the State furnished to the Rivkins was an action in lieu of prerogative writs. The 1947 New Jersey Constitution preserved the substance of common law prerogative writ review by permitting parties to seek "review, hearing and relief" in the Superior Court of all actions of municipal agencies. *N.J. Const.* art. VI, § 5, ¶ 4. New Jersey Court *Rule* 4:69 implements this constitutional provision. A court may set aside a municipal board decision if it is shown to be arbitrary, capricious or unreasonable, not supported in the evidence, or otherwise contrary to law. *Reid v. Township of Hazlet,* 198 *N.J.Super.* 229, 486 *A.*2d 940 (App.Div.), *certif. denied,* 101 *N.J.* 262, 501 *A.*2d 931 (1985); *Green Acres of Verona v. Borough of Verona,* 146 *N.J.Super.* 468, 470, 370 *A.*2d 53 (App.Div.1977).

■ Plaintiffs contend that the action in lieu of prerogative writs is not an adequate remedy because it does not enable them to recover damages, attorney's fees or costs. In *Parratt,* the Court concluded, "Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process." *Parratt, supra,* 451 *U.S.* at 544, 101 *S.Ct.* at 1917, 68 *L.Ed.*2d at 434. *Accord Ayers v. Jackson Township,* 202 *N.J.Super.* 106, 128–29, 493 *A.*2d 1314 (App.Div.1985) ("[A] state remedy may be sufficient, even if not as complete as that allowed under 42 *U.S.C.* § 1983."), *aff'd in part and rev'd in part,* 106 *N.J.* 557, 525 *A.*2d 287 (1987).

Plaintiffs' action in lieu of prerogative writs provided an adequate state post-deprivation remedy as required by the *Parratt* doctrine. The remedies provided were quite complete. After reviewing the proceedings and decision of the Rent Leveling Board, the trial court found that Baltarzuk's improper conduct had prejudiced the Rivkins. The court remanded for a new hearing and barred Baltarzuk from participating in the case. After re-hearing the matter, the Board awarded plaintiffs an additional

$25,089.67 in qualifying capital improvements. The total of the two sums approved by the Board amounted to 77 per cent of the Rivkins' original request. The additional rent increase redressed all of the economic claims that plaintiffs possessed. In a second prerogative writ action, the trial court upheld the action of the Dover Board as a fair and reasonable assessment of the proofs. As the Third Circuit concluded in a case in which plaintiff ultimately received its desired dance hall license through the appeal process, "[D]elay alone does not [ordinarily] create a procedural due process violation." *Midnight Sessions Ltd. v. City of Philadelphia,* 945 *F.*2d 667, 682 (3d Cir.1991), *cert. denied,* 503 *U.S.* 984, 112 *S.Ct.* 1668, 118 *L.Ed.*2d 389 (1992).

The remaining question is whether the absence of a specific provision authorizing attorney's fees to prevailing parties in prerogative writ actions causes the state remedy to be constitutionally inadequate. *Parratt* makes clear that state remedies need not provide all the relief that would have been available if the plaintiff were successful under § 1983. Thus, the state remedies would not be considered inadequate simply because they did not allow for the recovery of attorney's fees. *Weimer v. Amen,* 870 *F.*2d 1400, 1405 (8th Cir.1989); *Wilson v. Beebe,* 770 *F.*2d 578, 584 (6th Cir.1985).[5]

In addition, New Jersey has recently increased judicial authority to allow counsel fees to the prevailing party in a civil action. *N.J.S.A.* 2A:15–59.1. While we do not decide the issue in this case, it appears a permissible interpretation to conclude that a court may award counsel fees to the prevailing party when a local board "without any reasonable basis in law or equity" refuses to

---

[5] This case illustrates again the "difficulty that local agencies and reviewing courts have experienced in the administration of rent control ordinances." *Mayes v. Jackson Township Rent Leveling Bd.,* 103 *N.J.* 362, 376, 511 *A.*2d 589 (1986), *cert. denied,* 479 *U.S.* 1090, 107 *S.Ct.* 1300, 94 *L.Ed.*2d 155 (1987). A system of laws under which a party spends over $50,000 in legal fees to obtain a $59,000 rent adjustment seems a poor method of protecting the public. (The trial court allowed only $39,000 of those fees.)

accede to a clearly meritorious appeal. *Ibid.* A proposed Rule of Court would supplement the relief provided in the statute. *See Proposed Rule Amendment on Frivolous Litigation,* 143 *N.J.L.J.* 370 (Jan. 29, 1996).

Because the State provided an adequate post-deprivation remedy to redress the aberrant conduct of the board member or the Board, plaintiffs' rights to procedural due process were not violated. Therefore, plaintiffs cannot sustain an action on that basis for damages and attorney's fees under § 1983.

## V

### EQUAL PROTECTION

We here come to the analysis that may best reflect the core values of 42 *U.S.C.* § 1983. Obviously, claimants may not escape the teaching of *Parratt* and *Hudson* by relabeling procedural due process claims as equal protection claims. In his concurring opinion in *Albright,* Justice Kennedy cautioned against allowing *Parratt* to be diluted and, in some respects, circumvented by such pleading exercises. *Albright, supra,* 510 *U.S.* at ——, 114 *S.Ct.* at 819, 127 *L.Ed.*2d at 131.

> It is not enough simply to give these state law claims labels such as "due process" or "equal protection" in order to raise a substantial federal question under section 1983. As has been often stated, "[t]he violation of a state statute does not automatically give rise to a violation of rights secured by the Constitution."
>
> [*Creative Environments, supra,* 680 *F.*2d at 833 (citations omitted).]

Section 1983's powerful remedy should be reserved for claims involving "gross abuse of power, invidious discrimination, or fundamentally unfair procedures." *Id.* at 832 n. 9. Proving a deprivation of equal protection rights in a dispute with a municipal agency requires a distinct measure of proof. The majesty of the Equal Protection Clause should not be invoked every time that applications are incorrectly denied by a municipal agency.

> If disgruntled permit applicants could create constitutional claims merely by alleging that they were treated differently from a similarly situated applicant, the correctness of virtually any state permit denial would become subject to litigation

in federal court. Limiting such claims is essential to prevent federal courts from turning into "zoning board[s] of appeals." *Village of Belle Terre v. Boraas,* 416 *U.S.* 1, 12, 94 *S.Ct.* 1536, 1542, 39 *L.Ed.*2d 797 (1974) (Marshall, J., dissenting). [*Nestor Colon Medina & Sucesores, Inc. v. Custodio,* 964 *F.*2d 32, 44–45 (1st Cir.1992).]

■ Ordinarily, an equal protection plaintiff must be singled out because of membership in a class and cannot be just the victim of a random act of governmental incompetence. Furthermore, "the state's act of singling out an individual for differential treatment does not itself create the class [as that] would make ... every arbitrary act of government[ ] a violation of the Constitution." *Albright v. Oliver,* 975 *F.*2d 343, 348 (7th Cir.1992), *aff'd on other grounds,* 510 *U.S.* 266, 114 *S.Ct.* 807, 127 *L.Ed.*2d 114 (1994). Therefore, successful equal protection claimants usually demonstrate purposeful discrimination based on membership in a protected class, such as race. For example, in *Wilson v. City of North Little Rock,* 801 *F.*2d 316 (8th Cir.1986), the court reinstated plaintiff's equal protection claim against police officers who allegedly set up roadblocks and harassed black patrons of plaintiff's roller skating rink. *See also Watts v. Burkhart, supra,* 854 *F.*2d at 849 (Nelson, J., concurring) ("To turn the laws against a person because of his race, as the [medical] board members are said to have done here, is to deny that person the equal protection of the laws . . . .").

■ Similarly, discrimination on the basis of political beliefs may give rise to a First Amendment claim. *See Elrod v. Burns,* 427 *U.S.* 347, 96 *S.Ct.* 2673, 49 *L.Ed.*2d 547 (1976) (government interference with property right in form of one's employment in retaliation for exercise of one's First Amendment rights is actionable under § 1983).

## VI

## CONCLUSION

To sum up, the Act of 1871 was a response to a profound breakdown in state government. Congress guaranteed by Section

1 of the Act that every person should have a federal remedy for failure of any state actor to afford a person the rights, privileges and immunities secured by the Constitution and laws of the United States.

Among the rights secured by the Fourteenth Amendment is that no state shall deprive a person of property without due process of law, nor deny to that person the equal protection of the laws. In the setting of municipal land use controversies, our State has well established procedures, including judicial review of municipal governance, to assure government under law. *See Pizzo Mantin Group v. Township of Randolph,* 137 *N.J.* 216, 645 *A.*2d 89 (1994) (holding that municipal government may not exercise unguided developmental powers but must incorporate standards of decision in duly-enacted ordinances).

■ We are satisfied that the principles of *Parratt* and *Hudson* provide an appropriate basis for concluding that plaintiffs were not deprived of property without the due process of law guaranteed by the Fourteenth Amendment. Generally, litigants need not exhaust their state administrative or judicial remedies before bringing a § 1983 claim. *Patsy v. Florida Bd. of Regents,* 457 *U.S.* 496, 102 *S.Ct.* 2557, 73 *L.Ed.*2d 172 (1982); *Monroe v. Pape, supra,* 365 *U.S.* 167, 81 *S.Ct.* 473, 5 *L.Ed.*2d 492 (1961). However, as applied to municipal land use cases, the *Parratt* doctrine is an analog to the familiar doctrine of ripeness. In *Williamson Planning Comm'n v. Hamilton Bank,* 473 *U.S.* 172, 195, 105 *S.Ct.* 3108, 3121, 87 *L.Ed.*2d 126, 144 (1985), the Court stated, "The recognition that a property owner has not suffered a violation of the Just Compensation Clause until the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the State for obtaining such compensation is analogous to the Court's holding in *Parratt.*" Unlike other constitutional violations that are complete at the moment they occur, a deprivation of property without procedural due process does not arise until the plaintiffs are actually denied appropriate procedures for redress in the state system. *Gilmere v. City of*

*Atlanta,* 774 *F.*2d 1495, 1499 (11th Cir.1985) (citing *Parratt, supra,* 451 *U.S.* at 541–44, 101 *S.Ct.* at 1916–17), *cert. denied,* 476 *U.S.* 1115, 106 *S.Ct.* 1970, 90 *L.Ed.*2d 654 (1986). In *MacDonald, Sommer & Frates v. Yolo County,* 477 *U.S.* 340, 348, 106 *S.Ct.* 2561, 2566, 91 *L.Ed.*2d 285, 294 (1986), the Court held that a planning commission's decision to deny plaintiff's subdivision proposal may amount to a taking if it goes "too far," but said that a court "cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." By analogy, the claim that property has been taken by a rent leveling board without procedural due process cannot be known until the process is complete.

We are thus satisfied that the *Parratt* doctrine provides an appropriate basis for dismissing plaintiffs' procedural due process claim. Professor Fallon suggests that it would be preferable to view *"Parratt* as implementing a species of abstention doctrine [because it] would put the arguments for requiring litigants to proceed in state court into honest view, where they could be evaluated by commentators and by Congress." Richard H. Fallon, *Some Confusions About Due Process, Judicial Review, and Constitutional Remedies,* 93 *Colum.L.Rev.* 309, 345–46 (1993) (footnote omitted). As it stands now, "[t]he common sense teaching of *Parratt* is that some questions of property, contract, and tort law are best resolved by state legal systems without resort to the federal courts, even when a state actor is the alleged wrongdoer." *Albright, supra,* 510 *U.S.* at ——, 114 *S.Ct.* at 818, 127 *L.Ed.*2d at 130 (Kennedy, J., concurring). So long as state legal systems remain committed to principles of equal justice and provide plain and adequate remedies to prevent unconstitutional deprivations of property, there is no occasion for plaintiffs to seek redress in federal court or under federal law. Unless a substantial federal question is shown, land use decisions should "properly rest with the community that is ultimately—and intimately—affected." *Gardner v. Baltimore Mayor & City Council,* 969 *F.*2d 63, 68 (4th Cir.1992).

When, however, a government agency has engaged in egregious misconduct rising to the level of a substantive due process violation or has invidiously discriminated against a member of society, a § 1983 violation occurs "regardless of the fairness of the procedures used to implement" the abuse. *Daniels v. Williams, supra,* 474 *U.S.* at 331, 106 *S.Ct.* at 665, 88 *L.Ed.*2d at 668. Very often, conduct of that nature may violate other provisions of the federal Civil Rights Act, such as 42 *U.S.C.* § 1981, or our own Law Against Discrimination, *N.J.S.A.* 10:5–1 to 10:5–42. In this case, the conduct of Mr. Baltarzuk may have been ill-tempered, or even rude, but there is not a shred of evidence that he bore any resentment against the Rivkins on account of political, racial or religious affiliations. The grievances between the Rivkins and Baltarzuk and the Board, as in almost every such local controversy, were all economic. Perhaps Baltarzuk's disqualification should have occurred at an earlier stage. Still, disputes about the regularity of state procedures do not represent the type of egregious conduct that rises to the level of a substantive due process violation.

In *Fair Assessment in Real Estate v. McNary,* 454 *U.S.* 100, 102 *S.Ct.* 177, 70 *L.Ed.*2d 271 (1981), the principles of which infuse our decision today in *General Motors v. Linden, supra,* Justice Rehnquist wrote:

> To allow such suits [§ 1983 actions for improper tax assessments] ... merely on the assertion that the tax collected was willfully and maliciously discriminatory against a certain type of property ... would result in this Court being a source of appellate review of all state property tax classifications.
>
> . . . .
>
> [Such interference with state systems would be contrary to] the scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts.
>
> . . . .
>
> [Aggrieved parties] must seek protection of their federal rights by state remedies, provided ... that those remedies are plain, adequate, and complete, and may ultimately seek review of the state decisions in this Court.
>
> [*Id.* at 114–16, 102 *S.Ct.* at 185–86, 70 *L.Ed.*2d at 282–83 (quotations, citations and footnote omitted).]

Of course, as do we, Justice Rehnquist excepted from this categorization cases of invidious discrimination based upon classifications such as race. *Id.* at 107 n. 4, 102 *S.Ct.* at 181 n. 4, 70 *L.Ed.*2d at 278 n. 4.

The judgment of the Appellate Division is affirmed.

For affirmation—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, GARIBALDI, STEIN and COLEMAN join in Justice O'HERN's opinion—7.

Opposed—None.